LYNCH, Chief Judge.
Juanita Sánchez and 7,124 additional named plaintiffs appeal from a Rule 12(b)(1) dismissal of their claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680. Sánchez and her co-plaintiffs assert they have suffered tort injuries because of the United States Navy’s alleged negligence in emitting certain pollutants during military exercises (which ended in 2003) at the Atlantic Fleet Weapons Training Facility (AFWTF) on Vieques Island, Puerto Rico. The United States responds that the limited Congressional abrogation of sovereign immunity in the FTCA does not extend to these claims under the discretionary function exception to the FTCA, controlling Supreme Court precedent, and our own controlling precedent in Abreu v. United States, 468 F.3d 20 (1st Cir.2006). Because Congress did not intend to allow suits by private parties for damages under these circumstances, it has also determined that the federal courts lack jurisdiction over these claims. The Municipality of Vieques has participated as an amicus curiae in support of the plaintiffs’ claims.
Residents of Vieques brought a similar FTCA suit in Abreu for damages against the United States alleging that noise and air pollution from the Navy’s exercises on Vieques caused them tort injuries. Abreu, 468 F.3d at 23-24. This court affirmed a Rule 12(b)(1) dismissal of the suit for lack of jurisdiction, id. at 23, holding that a damages action under the FTCA was not available against the Navy based on an alleged violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6901 et seq. Abreu, 468 F.3d at 29-32. To impose liability under the FTCA because of a federal employee’s alleged failure to comply with a mandatory directive is not permissible, we held, if the imposition of liability “would undermine the purposes of the regulatory statute creating the mandatory directive.” Id. at 30. Given that Congress expressly precluded compensatory damages for RCRA violations and the plaintiffs’ suit would effectively enable them to get damages under the RCRA “under the guise of a FTCA claim,” we held that to allow the plaintiffs’ suit would undermine clear congressional intent. Id. at 32.
*89 This case also raises the discretionary function exception to the FTCA, 28 U.S.C. § 2680(a), which precludes FTCA actions against government conduct which is both within the discretion of the relevant government party and susceptible to policy-related judgments. Abreu, 468 F.3d at 26-28. Abreu raised doubts that FTCA suits may be brought against government parties regulated by a federal statutory scheme, as opposed to government parties that exercise regulatory authority pursuant to such a statutory scheme, but did not resolve the question.[1] Id. at 27-28.
The plaintiffs in this suit argue that neither Abreu nor the discretionary function exception to the waiver of sovereign immunity precludes their FTCA claim here. They have four theories, some of which require dismissal under Abreu and some under the discretionary function bar on jurisdiction. They assert that the Navy is susceptible to suit and acted beyond its discretion because it allegedly (1) violated mandatory directives concerning water pollution issued pursuant to the Clean Water Act (CWA), 33 U.S.C. §§ 1251-1387; (2) violated a pair of permits, which are not part of the record, that purportedly forbid firing depleted uranium bullets on Vie-ques; (3) violated unidentified internal regulations, policies, directives, and orders; and (4) failed to comply with a purported duty to warn the plaintiffs about pollution.
The district court rejected these arguments as well as several others not raised on appeal. Sanchez v. United States, 707 F.Supp.2d 216 (D.P.R.2010). We affirm the dismissal with prejudice for lack of jurisdiction.
I.
This court’s decisions in Abreu and Romero-Barcelo v. Brown, 643 F.2d 835 (1st Cir.1981), rev’d sub nom. Weinberger v. Romero-Barcelo, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), describe in detail the history of the Navy’s activities on Vieques. See Abreu, 468 F.3d at 23-24; Romero-Barcelo, 643 F.2d at 838-40. In brief, the Navy used 22,000 of the island’s 33,000 acres as a training ground and live ordnance range at various points between 1941 and 2003. It established an ammunition facility on the western end of the island and used the eastern half of the island as a training range, which included a “live impact area” and an adjacent “maneuver area.” Training exercises incorporated live munitions to simulate combat conditions, including artillery, mortar, small arms fire, naval surface fire, and aircraft strikes. The Navy also operated an open burning/open detonation facility on the island, where it incinerated and detonated unused ordnance. In May 2000, the Navy discontinued all live fire training exercises; all military exercises in Vieques were terminated as of April 30, 2003.
The 7,125 named plaintiffs filed this suit in September 2007, four years after the cessation of military operations on Vie-ques.[2] They allege that the Navy’s operations on Vieques produced hazardous and toxic waste and that the Navy acted negligently in storing and disposing of this *90 waste. In their complaint, the plaintiffs asserted eight state-law causes of action against the United States[3] under the FTCA, said to be: negligence, wrongful death, survival, negligent infliction of emotional distress, trespass, nuisance, civil taking, and fear and fright. The plaintiffs rely on a variety of ecological studies they assert demonstrate both heightened levels of certain heavy metals and other contaminants on Vieques and a link between these levels and higher rates of adverse health outcomes like infant mortality, cancer, hypertension, cirrhosis of the liver, and diabetes.
In their complaint, the plaintiffs also asserted that the Navy actions allegedly giving rise to their state-law claims for alleged injury[4] violated requirements outlined in various federal statutes, regulations, and policies, and thus were not within the Navy’s discretion. Only three of these purported requirements are relevant on appeal: (1) a permit issued under the CWA concerning water-based pollutants, (2) a pair of permits not in evidence concerning the discharge of depleted uranium bullets, and (3) unnamed internal regulations, policies, directives, and orders. The complaint also included the assertion, reasserted on appeal, that the Navy negligently failed to warn the plaintiffs about the pollution.
As to the first theory and the permit under the CWA, the Environmental Protection Agency (EPA) issued National Pollutant Discharge Elimination System (NPDES) Permit No. PRG990001 to the Navy’s AFWTF in 1984. The Navy had been ordered to apply for the permit by a federal district court. See Weinberger, 456 U.S. at 315, 102 S.Ct. 1798. In RomeroBarcelo, the federal courts found that “the discharge of ordnance had not polluted the waters” of Vieques, see Weinberger, 456 U.S. at 315, 102 S.Ct. 1798, and what the Navy had failed to do was to apply for an NPDES permit. Indeed, the Supreme Court reversed this court and held that the issuance of an injunction against the Navy was not required. Id. at 311-19, 102 S.Ct. 1798. The Navy did apply for a permit in 1979, and it contested Puerto Rico’s contention that it was not complying with CWA water quality standards. Id. at 315 n. 9, 102 S.Ct. 1798.
The NPDES permit, incorporating certain requirements set by the Environmental Quality Board of Puerto Rico, regulated the Navy’s discharge of ordnance within a specified geographic area of ocean around Vieques. In relevant part, the permit required that the Navy maintain water concentrations of certain compounds below the higher of (1) specific numerical requirements and (2) natural background concentration levels. The permit stated that “at no time shall the maximum values contained in the effluent exceed the water quality standards after mixing with the receiving water.”
The plaintiffs allege that the Navy violated the terms of this permit more than a decade ago. They rely in large part on an *91 attachment to an August 27, 1999, letter from William L. Muszynski, Deputy Regional Administrator for EPA-Region II, to Frank Rush, Assistant Secretary of Defense. The attachment states that between 1994 and April 1999, based on the Navy’s Discharge Monitoring Reports (DMRs), EPA had “documented 102 exceedances of the water quality-based permit limits” under the NPDES. It also stated that “[t]he potential for a greater number of actual violations exists than is evidenced in the DMRs” given the structure of reporting requirements. The plaintiffs have also identified a September 15, 1999, letter from the EPA notifying the Navy that the AFWTF had failed to comply with the NPDES and that therefore it had violated the CWA. An attachment to the September 1999 letter listed violations determined from the Navy’s DMRs and from an EPA site inspection.
As to the second theory and the alleged permits concerning depleted uranium, the plaintiffs rely on an April 1, 1999, letter to the Navy from the Nuclear Regulatory Commission and an accompanying report. The letter describes a particular event on February 19, 1999, in which two aircraft fired at least 263 depleted uranium 25 mm rounds on Vieques. It states, “The firing of [depleted uranium] ammunition on Navy or Marine Corps firing ranges is a violation of the Navy’s Master Material License No. 45-23645-01NA, and specifically, the Naval Radioactive Material Permit No. 13-00164-L1NP pertaining to depleted uranium.” The letter did not, however, include the text of these permits, nor have the plaintiffs otherwise done so. The report accompanying the letter explained only that this type of ammunition is to be used strictly during combat, and that the pilots of the two aircraft did not follow required Navy procedures that they check a manual that classifies types of ammunition.
According to the report, “[v]isual searches and radiological surveys indicated that only a limited area of the North Convoy site was actually affected.” The report stated that fifty-seven of the rounds had been recovered, “most of them completely intact,” and that “[o]nly a few holes exhibited residual contamination after the [depleted uranium] penetrator was removed.” It also stated that contaminated soil had been collected and packaged for disposal.
The plaintiffs allege that as of 2001 only 116 of the 263 rounds had been found and removed. They also cite an issue of the Vieques Issue Brief, a non-profit publication published by the Fellowship of Reconciliation, which refers to an unnamed study “conducted in the impact area” that found “significantly higher than background radiation levels about a mile from where the [depleted uranium] was reportedly fired.” The plaintiffs allege that this suggests depleted uranium has been used “on several other occasions on Vieques.”
As to the third theory and the unnamed internal regulations, policies, directives, and orders, little further explanation is needed. The plaintiffs do not make any specific claims as to the content of these purported internal requirements. They argue only that the AFWTF range manual requires documentation of both compliance with and violations of the range’s environmental procedures, and assert that this is evidence of the existence of mandatory internal requirements. The range manual contains general rules concerning permissible conduct on the island, and includes prohibitions on both intentionally discharging live ordnance into the water and discarding refuse or bilge from naval vessels. The plaintiffs argue, vaguely, that discovery of the internal reporting concerning these requirements would demonstrate vi *92 olations of mandatory environmental policies.
As to the fourth theory, the plaintiffs argue that the Navy undertook a duty to warn residents of Vieques about heightened concentrations of heavy metals on the island when it allegedly allowed fishermen and cattle herders into contaminated areas. The plaintiffs argue that the Navy’s failure to comply with this alleged duty was not susceptible to policy-related judgments and thus is a basis for FTCA liability. In support of this theory, the plaintiffs rely on (1) a provision in an AFWTF range manual stating that a training range would be closed on Tuesdays and Fridays from 7 A.M. to 9 A.M. “to permit local fishermen to retrieve fishing traps from adjacent waters,” and (2) an academic article that asserts, without citation, that “the U.S. Navy allowed local farmers to graze cows in the eastern part of Vieques including at the AFWTF,” A. Massol-Deyá, et al., Trace Elements Analysis in Forage Samples from a U.S. Navy Bombing Range (Vie-ques, Puerto Rico), 2 Int’l J. Envtl. Res. & Pub. Health 263, 264 (2005). The plaintiffs assert that the Navy’s alleged failure to issue a warning caused them to ingest contaminated food and travel in contaminated areas.
The district court rejected the arguments the plaintiffs present on appeal. It held that the plaintiffs (1) cannot rely on the Navy’s NPDES permit under the reasoning of Abreu because Congress clearly intended to preclude compensatory damages under the CWA, Sanchez, 707 F.Supp.2d at 232-33; (2) failed to specify how the alleged directives concerning depleted uranium bullets were mandatory, id. at 223; (3) failed to adequately plead their assertions concerning the unnamed internal requirements under Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), Sanchez, 707 F.Supp.2d at 233; and (4) failed to show that the Navy’s purported failure to warn was not discretionary and not susceptible to policy-related judgments and therefore was excluded from FTCA liability, id. at 230.
II.
The district court’s ultimate rulings were ones of law, which we review de novo. Sony BMG Music Entm’t v. Tenenbaum, 660 F.3d 487, 496 (1st Cir.2011).
On this Rule 12(b)(1) motion, we must “credit the plaintiffs well-pled factual allegations and draw all reasonable inferences in the plaintiffs favor.” Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010). To the extent that the plaintiffs challenge the district court’s discovery rulings, which they raise obliquely in reference to their argument concerning the firing of depleted uranium bullets, we review a denial of discovery for abuse of discretion. Braga v. Hodgson, 605 F.3d 58, 59 (1st Cir.2010).
The FTCA’s waiver of sovereign immunity from suit is a “limited waiver.” Molzof v. United States, 502 U.S. 301, 305, 112 S.Ct. 711, 116 L.Ed.2d 731 (1992); Abreu, 468 F.3d at 23. One exception to that waiver of immunity bars lawsuits “based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.” 28 U.S.C. § 2680(a). If this discretionary function exception applies, the FTCA’s jurisdictional grant under 28 U.S.C. § 1346(b) does not, such that “the [government] is completely immune from suit, and the claim must be dismissed for lack of subject matter jurisdiction.” Abreu, 468 F.3d at 25 (alteration in origi *93 nal) (quoting Santoni v. Potter, 369 F.3d 594, 602 (1st Cir.2004)) (internal quotation marks omitted).
Under United States v. Gaubert, 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), the discretionary function exception applies if the conduct underlying an FTCA claim both (1) “involves an element of judgment or choice,” Limone v. United States, 579 F.3d 79, 101 (1st Cir. 2009) (quoting Berkovitz v. United States, 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)) (internal quotation marks omitted), and (2) “was susceptible to policy-related analysis,” id. Conduct does not involve an element of judgment or choice if a “ ‘federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,’ because ‘the employee has no rightful option but to adhere to the directive.’ ” Gaubert, 499 U.S. at 322, 111 S.Ct. 1267 (quoting Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954). Conduct is susceptible to policy analysis if “some plausible policy justification could have undergirded the challenged conduct;” it is not relevant whether the conduct was “the end product of a policy-driven analysis.” Shansky v. United States, 164 F.3d 688, 692 (1st Cir.1999). This discretionary function bar to suit applies to activities by both civilian and military agencies covered by the FTCA.
As the Supreme Court has held, the discretionary function exception “marks the boundary between Congress’ willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals.” United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984) (quoted in Abreu, 468 F.3d at 25). Through this exception to the FTCA’s waiver of immunity, Congress sought to “prevent judicial ‘second-guessing’ of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.” Id. at 814, 104 S.Ct. 2755 (quoted in Abreu, 468 F.3d at 25). Accordingly, a complaint cannot survive a motion to dismiss unless it alleges facts “which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.” Gaubert, 499 U.S. at 324-25, 111 S.Ct. 1267.
The Supreme Court has held that the discretionary function exception does not bar suit when an employee violates a mandatory regulation. See id. at 324, 111 S.Ct. 1267. The Court has applied this rule in private party suits against defendant federal regulators, but not in suits against defendant federal regulated parties, Abreu, 468 F.3d at 27, and it has not made a distinction based on whether the regulated party is civilian or military. The Navy here fits into the defendant federal regulated party category. The Navy does not purport to exercise discretion under the regulatory regimes plaintiffs invoke in this litigation; rather, its discretion “comes from an entirely different source, namely, its authority to conduct military operations.” Id. In light of this, in Abreu we concluded that “the rule in Gaubert may well be inapplicable to mandatory directives aimed at a regulated party, where the regulated party is not exercising discretion under the mandatory statute or regulation.” Id. We also concluded there is a “particularly strong argument for limiting the rule of Gaubert where the exercise of military authority is involved, in view of the numerous cases cautioning the courts to avoid interfering with the exercise of discretionary military authority.” Id. at 27-28 (citing United States v. Shear *94 er, 473 U.S. 52, 57, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985)).
Our decision in Abreu did not reach the question of whether the Gaubert rule applies to regulated entities generally, as we found that the rule was inapplicable to the claims at issue in that suit for other reasons. 468 F.3d at 28. We need not address this more sweeping question here either, as it is clear that each of the plaintiffs’ four arguments fail for other reasons.
A. The Claim Based on the CWA and the NPDES Permit
When evaluating “contentions that the violation of mandatory requirements implies a waiver of sovereign immunity under the FTCA, we must refrain from imposing liability on the government when doing so would subvert a congressional decision to preclude regulated entity liability in the statute creating the mandatory directive.” Id. at 30. The Supreme Court in Dolan v. United States Postal Service, 546 U.S. 481, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006), stated that “the general rule that ‘a waiver of the Government’s sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign,’ ” did not apply in a case interpreting an exception to the FTCA. Id. at 491, 126 S.Ct. 1252 (quoting Lane v. Peña, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996)). “[T]he proper objective of a court attempting to construe one of the subsections of 28 U.S.C. § 2680 is to identify those circumstances which are within the words and reason of the exception—no less and no more.” Id. at 492,126 S.Ct. 1252 (quoting Kosak v. United States, 465 U.S. 848, 853 n. 9, 104 S.Ct. 1519, 79 L.Ed.2d 860 (1984)) (internal quotation marks omitted). In Abreu, we held that the unavailability of damages under the RCRA demonstrated that “allowing recovery of compensatory damages under the FTCA for RCRA violations would adversely affect the RCRA statutory scheme.”[5] 468 F.3d at 31.
The RCRA, we held, did not present “a situation in which Congress simply left unaddressed the question of damages liability under the mandatory statute.” Id. The statute’s citizen-suit provision confers jurisdiction on district courts to “restrain” violations and order persons in violation of permits, standards, regulations, conditions, requirements, prohibitions, or orders effective under the statute to “take such other action as may be necessary.” 42 U.S.C. § 6972(a); see also Abreu, 468 F.3d at 31. We stated that although this provision “confers jurisdiction over suits for injunctive relief,” Abreu, 468 F.3d at 31, the Supreme Court had recognized limits on this grant of jurisdiction to compensatory damages, id. (citing Meghrig v. RFC W., Inc., 516 U.S. 479, 484-85, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996)), and it was clear that Congress did not intend that the RCRA “authorize civil tort actions against the federal government for damages,” id. at 32 (quoting H. Rep. No. 102-111, at 15 (1991), as reprinted in 1992 U.S.C.C.A.N. 1287, 1301) (internal quotation mark omitted).
It is clear that Congress did not intend that the CWA authorize civil tort actions against the federal government for damages. The plaintiffs’ theory that they may sue under the FTCA for alleged CWA violations is expressly barred by the intent *95 of Congress. In Meghrig, the Supreme Court relied on its decision in Middlesex County Sewerage Authority v. National Sea Clammers Ass’n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), for the proposition that when “Congress has provided ‘elaborate enforcement provisions’ for remedying the violation of a federal statute ... ‘it cannot be assumed that Congress intended to authorize by implication additional judicial remedies for private citizens suing under’ the statute.” Meghrig, 516 U.S. at 487-88,116 S.Ct. 1251 (quoting Sea Clammers, 453 U.S. at 14, 101 S.Ct. 2615). The decision in Sea Clammers addressed, inter alia, the availability of compensatory damages under 33 U.S.C. § 1365(a), the citizen-suit provision in the CWA. 453 U.S. at 14, 101 S.Ct. 2615. That provision states that the district courts have jurisdiction “to enforce ... an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty” and apply “civil penalties” allowed in a separate provision. 33 U.S.C. § 1365(a).
In Sea Clammers, the Supreme Court held that both the structure and legislative history of the CWA dictate that “Congress intended that private remedies in addition to those expressly provided [in the CWA] should not be implied.” 453 U.S. at 18, 101 S.Ct. 2615. It reasoned that “[w]here, as here, Congress has made clear that implied private actions are not contemplated, the courts are not authorized to ignore this legislative judgment.” Id. The Court emphasized that the Senate Report for the Act “placed particular emphasis on the limited nature of the citizen suits being authorized.” Id. at 18 n. 27, 101 S.Ct. 2615 (citing S.Rep. No. 92-414, at 81 (1971)). It also emphasized that “the citizen-suit provision of the [CWA] was expressly modeled on the parallel provision of the Clean Air Act,” and that the “legislative history of the latter Act contains explicit indications that private enforcement suits were intended to be limited to the injunctive relief expressly provided for.” Id.
Sea Clammers does not only demand the conclusion that Congress intended to foreclose the availability of compensatory damages under the CWA. The decision also supports the conclusion, required by Abreu, that this clear congressional intent is relevant in determining the availability of an action for damages under the FTCA. See Abreu, 468 F.3d at 30. In Sea Clammers, the Court held that “[w]hen the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under [42 U.S.C.] § 1983.” Sea Clammers, 453 U.S. at 20, 101 S.Ct. 2615. “It is hard to believe,” the Court stated, “that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies,” including the citizen-suit provision in the CWA, 33 U.S.C. § 1365(a), and a parallel provision in the Marine Protection, Research, and Sanctuaries Act, 33 U.S.C. § 1415(g). Sea Clammers, 453 U.S. at 20, 101 S.Ct. 2615.
As in Abreu, “allowing the recovery of damages in a FTCA suit, based on the violation of a mandatory permitting requirement” under a federal statute that precludes compensatory damages “would undermine the intent of Congress.” Abreu, 468 F.3d at 32. For the reasons already articulated in Abreu, moreover, “the waiver of sovereign immunity reflected in various statutes must be interpreted in light of significant policies reflected in other related federal statutes.” Id. at 30. Sea Clammers makes clear that the decision not to permit damages under the CWA is a significant policy of that statute, and a policy significant enough to demand the conclusion that Congress intended the CWA to foreclose the availabili *96 ty of damages available before the statute was enacted.[6] Sea Clammers, 453 U.S. at 20-21,101 S.Ct. 2615.
The plaintiffs seek to evade this conclusion by arguing that our Abreu decision was inconsistent with previously decided Supreme Court precedent and with decisions of other courts. That is not so. With respect to the Supreme Court precedent, they argue that Abreu is inconsistent with Gaubert, as well as general statements by the Supreme Court that the FTCA’s exceptions should not be construed in an “unduly generous” fashion, see Kosak, 465 U.S. at 853 n. 9, 104 S.Ct. 1519; see also Block v. Neal, 460 U.S. 289, 298, 103 S.Ct. 1089, 75 L.Ed.2d 67 (1983). With respect to the decisions from beyond this circuit, the plaintiffs invoke a pair of district court decisions that postdate Abreu. See In re Katrina Canal Breaches Consol. Litig., 647 F.Supp.2d 644 (E.D.La. 2009); Adams v. United States, No. 03-0049, 2006 WL 3314571 (D.Idaho Nov. 14, 2006). They argue that these decisions demand that we confine Abreu to its facts and allow their present FTCA claim to proceed. We disagree.
A panel of this court is ordinarily “constrained by prior panel decisions directly (or even closely) on point.” United States v. Guzman, 419 F.3d 27, 31 (1st Cir.2005). A panel is not so bound when a prior panel decision has been undermined by (1) controlling authority that postdates the decision, like a Supreme Court opinion, en banc decision of the circuit, or statutory overruling, or (2) non-controlling authority that postdates the decision that may offer “a compelling reason for believing that the former panel, in light of new developments, would change its collective mind.” Id. The second exception, we have stated, “fairly may be described as hen’s-teeth rare.” Id.
The plaintiffs have hardly advanced an argument under the second of these exceptions, and they have advanced no argument under the first. The Supreme Court decisions do not postdate Abreu. Indeed, the Abreu panel carefully considered how the Supreme Court’s decision in Gaubert informed its analysis and how other Supreme Court precedent informed the breadth of exceptions to FTCA liability. The two district court opinions from beyond this circuit do not suffice to meet the exacting standard of the second exception.[7]
B. The Claim Concerning Depleted Uranium Bullets
A court inquiring into whether an FTCA claim falls within the discretionary function exception must first “identify the conduct that allegedly caused the harm.” Muniz-Rivera v. United States, 326 F.3d 8, 15 (1st Cir.2003); see also Irving v. United States, 162 F.3d 154, 162 (1st Cir. 1998) (en banc). This inquiry is a factual one. When facts relevant to a jurisdictional question are dispositive of both that jurisdictional question and portions of the merits, a Rule 12(b)(1) motion should be *97 granted “only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law.” Torres-Negrón v. J & N Records, LLC, 504 F.3d 151, 163 (1st Cir.2007) (quoting Trentacosta v. Frontier Pac. Aircraft Indus., Inc., 813 F.2d 1553, 1558 (9th Cir.1987)) (internal quotation marks omitted).
The parties largely agree on the facts concerning the firing of 263 uranium bullets described in the Navy’s April 1999 letter to the Nuclear Regulatory Commission and its accompanying report. They diverge, however, on whether additional incidents involving the firing of uranium bullets occurred on Vieques, and on whether the firing of uranium bullets caused the injuries alleged by the plaintiffs. The plaintiffs argue that their allegations are sufficient to raise disputed material facts. To do so, they must “identify specific facts derived from pleadings, depositions, answers to interrogatories, admissions and affidavits.” Magee v. United States, 121 F.3d 1, 2 (1st Cir.1997). As we have held, “[i]t is a long standing principle of this Circuit that bald assertions and unsupportable conclusions are not enough to create a genuine issue of material fact.” Rojas-Ithier v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 394 F.3d 40, 44 (1st Cir.2005).
The plaintiffs fall short of this standard for several reasons. They rely on one unnamed study for the proposition that depleted uranium bullets caused their injuries. In the portion of their complaint alleging the harm, they made no reference to uranium or radioactive materials. Instead, they referred to concentrations of certain heavy metals. The complaint did reference uranium in a brief description of the unexploded ordnance on the island and in a brief account of the alleged incident involving the 263 rounds, but these references have not been supported. These allegations are also not on par with the plaintiffs’ other allegations concerning the breadth of the Navy’s discretion. The complaint only cursorily mentioned the incident involving depleted uranium bullets as evidence of a larger pattern of pollution; it focused on allegations of causation concerning pollutants that the plaintiffs do not address on appeal.
Even if the plaintiffs had raised a material fact that the Navy’s firing of depleted uranium bullets caused the injuries they allege (as they have not), they have failed to adequately allege that the challenged conduct was non-discretionary, assuming Gaubert would apply here. Under Gaubert, conduct does not involve an element of judgment or choice if a “federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.” Gaubert, 499 U.S. at 322, 111 S.Ct. 1267 (emphasis added) (quoting Berkovitz, 486 U.S. at 536, 108 S.Ct. 1954) (internal quotation marks omitted). Without this specificity requirement, we have held, “the discretionary function exception would be a dead letter.” Shansky, 164 F.3d at 691.
This court has repeatedly rejected arguments that conduct was non-discretionary under Gaubert when FTCA plaintiffs have identified only vague, permissive, or unidentified requirements for government conduct. See, e.g., Muniz-Rivera, 326 F.3d at 16; Shansky, 164 F.3d at 691-92; Irving, 162 F.3d at 163-66. It is not sufficient for a plaintiff to identify a statute, regulation, or policy that contains mandatory directives; directives must be “directly applicable” to the challenged conduct. Muniz-Rivera, 326 F.3d at 16; see also Irving, 162 F.3d at 163 (holding that because regulations did not mandate “a particular modus operandi” for government employees or “otherwise materially restrict [their] flexibility,” they did not ren *98 der the government’s conduct non-discretionary). Nor may a plaintiff rely on an “unsubstantiated recollection of an unidentified policy statement;” “testimony that purports to describe written policies and regulations is no substitute for the original text.” Shansky, 164 F.3d at 692.
The plaintiffs here contend that they have identified policies that specifically eliminate the Navy’s discretion with respect to the firing of depleted uranium bullets. They have not, however, introduced the language of these permits or situated them within a broader regulatory scheme. The Navy letter and accompanying report plaintiffs rely on is surely more than an “unsubstantiated recollection of an unidentified policy statement,” see id., but the content of these purported requirements remains unclear. The letter only states that there has been a violation of the permit requirements; it does not identify the content of those requirements. The only concrete requirements referenced in the report pertain to internal Navy procedure concerning ammunition classifications, which is not connected in any way to either of the permits.
As we held in Irving, moreover, the Gaubert analysis requires attention to how a particular agency announces policy. Irving, 162 F.3d at 165. An agency may promulgate regulations on some topics but not others, it may rely on internal guidelines instead of published regulations, it may announce policy through rulemaking and adjudication, and so on. See id. These practices inform whether an agency statement constitutes a mandatory policy statement for purposes of the discretionary function exception; in Irving, for example, we could “well imagine that resort to informal indicia may be justified either when an agency’s legislative rules define the conduct of some employees, but not others ... or when legislative rules create ambiguity.” Id. Here, the plaintiffs have failed to show that the purported permits, even if they limit the firing of depleted uranium bullets, are mandatory in the relevant sense.
Our Abreu decision gives a further, related reason to reject the argument that this FTCA claim should go forward on the ground that the Navy’s conduct was non-discretionary. In Abreu, we recognized that congressional intent may foreclose a claim for damages against the United States premised on violations of federal law. Abreu, 468 F.3d at 29-32. Because the plaintiffs have neither introduced the text of the permits upon which they rely nor identified the statutory context governing the alleged permits, they have not come close to establishing that Congress intended that damages be available or unavailable for violations of the two alleged permits. In light of the many cases cautioning against interference with discretionary military authority, moreover, this is a particularly significant omission. See id. at 28.
The plaintiffs contend that they cannot produce the text of the two permits because the district court erroneously denied their motion for jurisdictional discovery. Even were the claim not waived,[8] we would reject it. A district court has discretion to defer pre-trial discovery pending resolution of a jurisdictional question when “the record indicates that discovery is unnecessary (or, at least, is unlikely to be useful) *99 in regard to establishing the essential jurisdictional facts.” Dynamic Image Techs., Inc. v. United States, 221 F.3d 34, 38 (1st Cir.2000). The plaintiffs’ discovery-request sought a broad range of documents, many of which had no apparent relationship to jurisdictional questions. The request did not mention the permits at issue, and only referenced depleted uranium in a pair of sweeping requests. The district court was well within its discretion in refusing to allow a “fishing expedition” by granting the plaintiffs’ “inherently speculative” discovery request. Sanchez, 707 F.Supp.2d at 231.
C. The Claims Based on Unnamed Internal Requirements
The same basic reasoning applies to the plaintiffs’ argument that unnamed internal requirements establish that the Navy’s conduct was non-discretionary. The plaintiffs argue that while they have not identified any specific regulations, policies, directives, or orders, their allegations are sufficient to support “the reasonable inference” that such requirements exist for purposes of the pleading standard outlined in Iqbal, 129 S.Ct. 1937. But the plaintiffs’ allegations say nothing of the specific content of the alleged internal directives, what these alleged directives require, or how the alleged requirements relate to the challenged conduct.
D. Claim of Alleged Failure to Warn
As in Abreu, the plaintiffs here cannot contest that “the military activities carried out by the Navy on Vieques over the past several decades have involved discretionary decision-making of the most fundamental kind, requiring balancing competing concerns of secrecy and safety, national security and public health.” Abreu, 468 F.3d at 26 (internal quotation marks omitted). The plaintiffs nonetheless allege that the Navy allowed them to enter, graze cattle, and fish in polluted areas of Vieques without providing further warning about pollution levels, and that this alleged decision was not susceptible to policy analysis. The plaintiffs’ argument does not raise the question of whether the alleged emitting of pollution itself was susceptible to policy-related considerations, only whether there was a duty to warn that was not susceptible to policy-related judgments. The source of this alleged non-discretionary duty to warn suffers from vagueness and indeterminacy[9] and so, as explained earlier, fails to meet the Gaubert requirements. In addition, the theory of liability has other flaws.
In two recent cases, this circuit rejected analogous arguments that safety concerns dictated a specific course of conduct that could not be subject to policy analysis. Shansky, 164 F.3d at 693 (rejecting the argument that “when safety becomes an issue, all else must yield”); Irving, 162 F.3d at 168 (holding that the purpose of OSHA is “to provide for a satisfactory standard of safety, not to guarantee absolute safety”); see also Shuman v. United States, 765 F.2d 283 (1st Cir.1985) (Navy protected from liability under the disere *100 tionary function exception because whether, and at what time, the Navy should have undertaken duty to warn contractor’s employees about hazards of working with asbestos was matter of discretion).
The plaintiffs do not address these cases and instead rely on out-of-circuit cases which neither bind us nor support their argument.[10] In particular, the plaintiffs rely on Andrulonis v. United States, 952 F.2d 652 (2d Cir.1991), and Whisnant v. United States, 400 F.3d 1177 (9th Cir. 2005). In Andrulonis, a government researcher contracted rabies after his supervisor failed to warn him about dangerous conditions in the laboratory where he worked. 952 F.2d at 653. The Second Circuit held that no policy considerations could explain a failure to warn about such “obvious, easily-correctable dangers in experiments.” Id. at 655. In Whisnant, the plaintiff alleged that he became ill because the government negligently failed to address “toxic mold” at a commissary on a Naval base. 400 F.3d at 1179-80. The Ninth Circuit agreed, holding that the mold presented an “obvious health hazard,” id. at 1183, and that “a failure to adhere to accepted professional standards is not susceptible to a policy analysis,” id. (quoting Bear Medicine v. United States ex rel. Sec’y of the Dep’t of Interior, 241 F.3d 1208, 1217 (9th Cir.2001)) (internal quotation mark omitted).
The present case does not present a situation akin to those in Andrulonis and Whisnant. Unlike the obvious, easily-correctable danger at issue in Andrulonis, the plaintiffs do not challenge an obvious health hazard or an easily-correctable danger from environmental effects.[11] Instead, the plaintiffs argue that the Navy assumed certain obligations concerning disclosure of pollution given that it detonated and fired live ammunition on Vieques during inherently polluting military exercises. Nor do the plaintiffs assert that the Navy’s conduct violated a professional set of guidelines like the professional guidelines at issue in Whisnant. Their argument instead amounts to the assertion that the pollution at issue here was known to be significant during the operations, and that therefore questions related to disclosure could not be subject to policy considerations.
This argument ignores that the Navy, like other agencies, must weigh competing interests between “secrecy and safety, national security and public health.” Abreu, 468 F.3d at 26 (internal quotation mark omitted).
*101 Both the D.C. and Ninth Circuits have recognized such competing considerations in similar situations concerning disclosures about pollutants by the United States military in cases holding that the discretionary function exception applies. See Loughlin v. United States, 393 F.3d 155 (D.C.Cir. 2004); In re Consol. U.S. Atmospheric Testing Litig., 820 F.2d 982 (9th Cir.1987). In Loughlin, the D.C. Circuit rejected the argument that the government’s decision to bury toxic World War I munitions under a Washington, D.C., neighborhood without public disclosure was not susceptible to policy considerations. 393 F.3d at 164-66. In Atmospheric Testing, the Ninth Circuit similarly rejected the argument that the government’s decision not to disclose radiation hazards from a military testing program were not susceptible to such considerations. 820 F.2d at 996-99.
Both courts, while noting the existence of safety risks, held that the government’s interests in security, secrecy, and public order were also relevant in its decision whether to make disclosures to the public. Whether to warn the public about the munitions, the D.C. Circuit held, “required balancing ‘competing concerns of secrecy and safety, national security and public health.’ ” Loughlin, 393 F.3d at 164 (quoting Loughlin v. United States, 286 F.Supp.2d 1, 23 (D.D.C.2003)). Similarly, whether to warn the public about the radiation, the Ninth Circuit held, “required balancing the magnitude of the risk from radiation exposure” against “the potential consequences of creating public anxiety and the health hazards inherent in the medical responses to the warning.” Atmospheric Testing, 820 F.2d at 997.
The plaintiffs attempt to distinguish these two cases by arguing that the Navy allegedly actively facilitated their exposure to health hazards, whereas the government actors in Loughlin and Atmospheric Testing did not. The plaintiffs have made no specific allegations that the government actively facilitated such exposure. They rely only on a range manual stating that the Navy occasionally allowed fishermen to retrieve traps from “adjacent waters” and a single journal article that states, without citation, that the Navy allowed farmers to graze cows in areas of the AFWTF. At most, these allegations show that on limited occasions the Navy permitted access to lands and waters in what was a discretionary decision. Plaintiffs do not claim that a statute or regulation mandated a duty to even do that, much less anything more than that. Moreover, these allegedly facilitative actions are no different from the facts in Loughlin and Atmospheric Testing, where the government also allegedly allowed members of the public to be exposed to pollutants.
In their reply brief, the plaintiffs also advance a variety of more minute factual distinctions between this case and both Loughlin and Atmospheric Testing. None of these .distinctions are relevant here. We do not rely on these two cases as binding authority. Rather, we rely on them as illustrative of the proposition that disclosures about safety risks attendant to military operations may be subject to other policy considerations. Here, the government had reason to be concerned with the national security implications of disclosing information about its operations on Vieques.
Numerous cases in the courts of appeals hold that the government’s decision whether to warn about the presence of toxins, carcinogens, or poisons falls under the discretionary function exception to the FTCA’s waiver of sovereign immunity. See Ross v. United States, 129 Fed.Appx. 449 (10th Cir.2005) (discretionary function exception applied to Air Force’s decision whether and how to warn neighbors of *102 contamination of ground water by trichloroethylene buried by Air Force); Savary v. United States, No. CV-95-07752, 1999 WL 1178956 (9th Cir. Dec. 14, 1999) (per curiam) (table case) (Jet Propulsion Laboratory’s failure to issue warnings to its employees regarding dangers of exposure to soil and groundwater contaminated by hazardous materials fell under the discretionary function exception because the decision to make such a warning required judgments balancing the magnitude of risk associated with contamination with the risks and burdens of a public warning program); Minns v. United States, 155 F.3d 445, 450 (4th Cir.1998) (military’s decision whether to warn veterans about dangers of inoculations or exposure to pesticides fell under discretionary function exception, and “questioning the military’s decision” would create a “court-intrusion problem”); Maas v. United States, 94 F.3d 291, 297 (7th Cir.1996) (Air Force’s decision not to warn veterans of cancer dangers associated with cleaning up crash site of bomber carrying nuclear weapons fell under discretionary function exception: “[djeciding whether health risks justify the cost of a notification program, and balancing the cost and the effectiveness of a type of warning, are discretionary decisions”); Angle v. United States, No. 95-1015, 1996 WL 343531, at *3 (6th Cir. June 20, 1996) (per curiam) (table case) (Air Force’s decision not to warn occupants of base housing of lead paint contamination fell under discretionary function exception: the Air Force “had to balance the potential effectiveness of a general warning against the possibility that such a warning might cause unfounded fears”); Daigle v. Shell Oil Co., 972 F.2d 1527 (10th Cir.1992) (Army’s failure to warn residents that cleanup of nearby toxic waste dump could cause exposure to waste fell under discretionary function exception because procedures implementing cleanup implicated policy considerations underlying CERCLA response actions). It is not just the military which has been shielded by the discretionary function exception from claims under the FTCA for alleged breach of a duty to warn; non-military government agencies have been so shielded as well. See Smith v. Johns-Manville Corp., 795 F.2d 301 (3d Cir.1986) (General Service Administration’s decision to sell surplus asbestos “as is” without warnings or warranties fell within the discretionary function exception); Begay v. United States, 768 F.2d 1059 (9th Cir.1985) (decision of Public Health Service not to warn uranium miners of the dangers they were exposed to was clearly within the ambit of the discretionary function exception).
The law as announced by the Supreme Court requires dismissal of the claim. It is clear that the Navy engaged in both choice and judgment as to who had permission to be in AFWTF lands and waters and what was said about that access. See Gaubert, 499 U.S. at 325, 111 S.Ct. 1267 (discretionary function exception reached decisions made by federal regulators in overseeing savings and loan association’s operations); Boyle v. United Techs. Corp., 487 U.S. 500, 511, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988) (selection of appropriate design for military equipment to be used by the Armed Forces is a discretionary function); Varig Airlines, 467 U.S. at 819-20, 104 S.Ct. 2755 (discretionary function exception barred claims based on FAA’s alleged negligence in implementing and applying a “spot-check” system of compliance review). It is also clear that this exercise of discretion is susceptible to policy-related judgments. The Navy’s choices were not pursuant to meeting the regulatory requirements of another agency, but pursuant to its judgment as to how it conducted its military operations. As the government’s brief says, ‘With respect *103 to any warning, the Navy would have had to balance its military and national security needs against any perceived benefits to public health and safety in light of the risks and burdens of a warning program and the great public anxiety warnings could create.”
The Supreme Court has made clear that federal courts are constrained not to interfere with the exercise of such discretion by any agency, and that is particularly so in the running of military operations. No concerns are raised as to civilian control of the military. In a case reversing an injunction against the Navy for alleged NEPA violations, the Supreme Court noted, “ ‘To be prepared for war is one of the most effectual means of preserving peace.’ ... One of the most important ways the Navy prepares for war is through integrated training exercises at sea.” Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 370, 172 L.Ed.2d 249 (2008) (quoting 1 Messages and Papers of the Presidents 57 (J. Richardson comp. 1897) (statement of Pres. George Washington)). Courts “give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.” Id. at 377 (quoting Goldman v. Weinberger, 475 U.S. 503, 507, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986)) (internal quotation marks omitted). Plaintiffs do not even claim that these judgment calls violated mandatory federal law.
It is not the role of the courts to second-guess the Navy’s conclusions after it weighed these competing considerations. See Gaubert, 499 U.S. at 323, 111 S.Ct. 1267. As a result, the courts have been stripped of their jurisdiction over this claim and may not entertain this cause of action.
III.
For the reasons stated above, the dismissal of plaintiffs’ complaint was required by law.
This opinion takes no position on whether the Navy’s operations on Vieques have had adverse health effects on the island’s residents. It holds only that the plaintiffs have not stated a valid claim for damages under the FTCA.
Nonetheless, while the majority’s view is that the dismissal of the suit must be affirmed, and the dissent disagrees, the plaintiffs’ pleadings, taken as true, raise serious health concerns. The government has acknowledged the existence of these concerns.[12] The majority and the dissent agree that these issues should be brought to the attention of Congress. The Clerk of Court is instructed to send a copy of this opinion to the leadership of both the House and Senate.
The judgment of the district court is affirmed. No costs are awarded.

. It was unnecessary to address the discretionary function exception in that case for other reasons. Abren v. United States, 468 F.3d 20, 28 (1st Cir.2006). Given that Congress made clear its intent to prohibit compensatory damages against the United States for RCRA violations, it was irrelevant whether the Navy had discretion to violate the RCRA directives. Id. at 29-31.

. The plaintiffs filed their original complaint in the U.S. District Court for the District of Columbia. In March 2009, the case was transferred for lack of venue to the District of Puerto Rico.

. In their first amended complaint, the plaintiffs listed various federal agencies and officials as defendants, but they have voluntarily dismissed all claims against parties other than the United States.

. The complaint also invoked purported requirements under the Federal Facilities Compliance Act, 42 U.S.C. § 6961; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq.; the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. § 9601 et seq.; 32 C.F.R. § 700.832; 10 U.S.C. § 2705; and a provision of the Navy Environmental and Natural Resources Program Manual, OPNA-VINST 5090.IB CH-2 § 20-5.1. The district court held that none of these provisions rendered the alleged conduct non-discretionary, and this holding has not been appealed.

. Abreu also involved a claim that the Navy was subject to an FTCA suit because it had violated the CWA by not having a valid NPDES permit. 468 F.3d at 28-29. Citing United States v. Zenón-Encamación, 387 F.3d 60, 63-64 (1st Cir.2004), Abreu rejected further consideration of the theory because it was clear the Navy did have a valid permit. 468 F.3d at 28-29.

. Whether or not a presidential exception can be made to compliance with the CWA does not undermine either the congressional determination that damages are unavailable under the CWA or that suit may not be maintained under the FTCA absent compliance with the conditions specified in that Act.

. The plaintiffs could have filed timely claims under the CWA for alleged violations of that Act. They could not have recovered damages, a limitation this suit attempts to bypass. This suit also attempts to bypass the administrative procedures under the Act and the creation of an administrative record. There were other mechanisms available to secure compliance with the CWA. We reject as untrue and unwarranted hyperbole the argument of amicus that dismissal of this case "condones” any violations by the Navy.

. The plaintiffs cite no case law in asserting this claim. They argue, in a single paragraph of their brief, that the district court put them in an "impossible position” by requiring that they show the two permits contained mandatory language and yet disallowing jurisdictional discovery. Claims presented in a perfunctory manner are deemed waived. Cortes-Rivera v. Dep’t of Corr. & Rehab., 626 F.3d 21, 26 (1st Cir.2010).

. Before the district court, the plaintiffs made a related argument that 10 U.S.C. § 2705 imposes a duty on the Secretary of Defense to report certain environmental degradation to the EPA and authorities in Vieques. The plaintiffs do not rely on this provision on appeal and so have waived any argument.
By its clear terms, the statute also reinforces that the Secretary has discretion. It states that the Secretary “shall take such actions as necessary" as to disclosure. Id. § 2705(a) (emphasis added). Further, the Secretary establishes review committees only “[wjhenever possible and practical.” Id. § 2705(c) (emphasis added). The Secretary “may ” seek technical assistance. Id. § 2705(e)(1) (emphasis added).

. In addition to decisions from beyond this circuit, the plaintiffs invoke the Supreme Court’s decision in Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). That decision did not involve the discretionary function exception and instead concerned the meaning of "in the same manner and to the extent as a private individual under like circumstances,” in 28 U.S.C. § 2674. Indian Towing, 350 U.S. at 64—65, 76 S.Ct. 122. We need not address it further here.

. We do not reach the question of whether the plaintiffs here alleged a causal connection between the claimed lack of notice of pollutants inherent in military exercises and their injuries.
Turning to the issue of failure to warn, in fact, it was well known the Navy was engaged in such military exercises. "[I]n 1977, the government of Puerto Rico initiated litigation which eventually resulted in a district court order requiring the Navy to comply with certain federal environmental statutes....” Abreu, 468 F.3d at 23. The Navy obtained an interim permit for the AFWTF in 1980. Id. at 24. In 1983, the Navy and the government of Puerto Rico entered into a Memorandum of Understanding under which the Navy made certain changes in the AFWTF. Id. The plaintiffs do not and cannot make the claim that the Navy never provided any notice of the environmental impact of its activities.

. The brief of the United States has advised the court that the Agency for Toxic Substance Disease Registry (ATSDR) of the Centers for Disease Control and Prevention "is in the process of taking a ‘fresh look' at potential environmental exposures to the population of Vieques as a result of the Navy's training activities.” The reasons stated for the review were gaps in the data on which prior reports had relied, and that the prior reports did not adequately consider either vulnerable populations or the limitations and uncertainty of the findings.